IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF WEST VIRGINIA

FILED

JUL 1 6 2018

U.S. DISTRICT COURT-WVND
MARTINSBURG, WV  25401

| IN THE MATTER OF THE SEARCH **SAMSUNG GALAXY S8- MEID #089506202400479234** CURRENTLY LOCATED AT **ATF MARTINSBURG, WV, FIELD OFFICE** | Case No.  3:18 MJ 74 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Seth Cox**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") since September 2014.  I am a graduate of the Uniform Police Training Program and Criminal Investigator Training Program at the Federal Law Enforcement Training Program in Glynco, GA.  This included training in the investigative techniques of criminal violations of the Gun Control Act (18 U.S.C ch. 44) and the National Firearms Act (26 U.S.C. ch. 53).  Prior to joining ATF, I was an Officer with the United States Park Police in Washington, DC for close to five years.  I have a Bachelor of Arts in Criminology and a Master's in Public Administration from West Virginia University.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.      The property to be searched is a **SAMSUNG GALAXY S8- MEID #089506202400479234** hereinafter the "Device." The Device is currently located at the ATF Martinsburg Field Office evidence vault in Martinsburg, Berkeley County, WV.

5.      The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

Overview of Investigation

6.      I and other law enforcement agencies have been involved in the investigation of Raymond HOAK since June 2018. The investigation has information from a source credible to law enforcement, referred to herein as the Confidential Source (CS).[1] CS has no criminal convictions. CS is not a target or subject in any pending investigations that I am aware of. CS is not providing information in an effort to avoid prosecution or obtain a more lenient sentencing recommendation. CS has no charges pending against him. Since the start of his cooperation, CS has provided information that I or other law enforcement officers have independently corroborated. I have never found CS to have knowingly provided false information.

---

[1] I will refer to the Confidential Source, upon whose information I have relied, simply as "CS" rather than by a true name. I will also use masculine pronouns regardless of gender, all in effort to protect the CS's identity.

2

Information Received on Felon in Possession of Firearm

7.      On June 26, 2018, investigators with the Eastern Panhandle Drug & Violent Crimes Task Force (EPD&VCTF) relayed information about a felon in possession of firearms in Jefferson County, WV.  Investigators stated they met with the CS who stated that Raymond HOAK was in possession of firearms at his residence.  Investigators relayed that they know HOAK to be a convicted felon.

8.      On June 27, 2018, I conducted a criminal history check of HOAK through the National Crime Information Center.  The criminal history check revealed that on November 20, 2007, HOAK was convicted of *Voluntary Manslaughter*, in the Circuit Court of Berkeley County, WV, in case no. 03-F-53.  Members of the EPD&VCTF relayed information that this conviction is in reference to a shooting committed by HOAK in Jefferson County, WV resulting in the death of the victim.  HOAK, therefore, stands convicted of Voluntary Manslaughter and is prohibited from possessing a firearm by virtue of this felony conviction.

9.      On June 28, 2018, Task Force Officer Billy Custer and I met with the CS to discuss the information further.  The CS provided information that he has known HOAK for over ten years and has seen HOAK's firearms inside of HOAK's residence.

10.     The CS has stated that HOAK stores rifles, shotguns, pistols, and ammunition inside of concealable hidden compartment, which HOAK built into a closet of a guest bedroom in the residence.  The CS stated that HOAK also keeps a pistol in dresser drawer of the master bedroom.  Additionally, the CS stated there is a silver pistol in a locked safe at the residence.

11.     The CS states that HOAK shows the firearms to numerous friends and family and has brandished the firearms to family members during disputes within the last year.

12.     The CS stated that the last time he saw the firearms at the HOAK's residence was

3

approximately June 14, 2018.

13.     The CS stated that the only two occupants of the residence are HOAK and his wife, and that HOAK's wife has recently vacated the premises.  According to CS, the firearms at HOAK's residence do not belong to HOAK's wife.

14.     The CS also provided details of HOAK's sale and distribution of Controlled Deadly Substances (CDS) from HOAK's residence.  The CS stated that HOAK has been known to store CDS in a carport and wood stove on the curtilage of the residence.  According to the CS, HOAK distributes oxycodone pills, marijuana, and marijuana wax to his customers from his residence.  The CS indicated that HOAK has sold CDS from the premises as recently as June 22, 2018.

15.     The CS stated that HOAK utilizes his cellular device to arrange his CDS sales.  I know from training and experience that CDS dealers often utilize cellular devices to broker and complete the sale of CDS.  I also know that cellular telephones can store information identifying suppliers of CDS, as well as evidence relating to prior CDS sales.

16.     On June 28, 2018, I conducted a search of the West Virginia Board of Medicine to determine whether HOAK is licensed to practice medicine or distribute of any type of prescription medication.  No record was found.

17.     On June 29, 2018, law enforcement officers executed a search warrant at the residence of Raymond HOAK, in Kearnysville, WV.  Nine firearms and numerous rounds of assorted ammunition were recovered from the residence.  Items of individually wrapped bags of marijuana, a jar of bulk amount of marijuana, and distribution items to include bags and a scale were also recovered from the residence. The Device was also yielded from the master bedroom where HOAK was sleeping.  HOAK was the sole occupant of the residence at the time of search

4

warrant execution.

18.     HOAK was placed under arrest and subsequently consented to a custodial interview at the ATF Martinsburg Field Office.  During the interview, HOAK admitted to possession of the marijuana evidence.  HOAK further stated that he purchases his marijuana in bulk quantity because it is "easier."  HOAK states that he smokes marijuana with his co-workers and that he possesses the individually wrapped bags to distribute to his co-workers to monitor their usage.

19.     The Device is currently in the lawful possession of the ATF.  It came into ATF's possession when seized during execution of the aforementioned search warrant.  Therefore, while the ATF might already have all necessary authority to examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws.

20.     The Device is currently in storage at the ATF Martinsburg Field Office, 40 Compass Pointe, Martinsburg, WV.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the ATF.

## TECHNICAL TERMS

21.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.

6

This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This

7

removable storage media can store any digital data. Most PDAs run computer
software, giving them many of the same capabilities as personal computers. For
example, PDA users can work with word-processing documents, spreadsheets,
and presentations. PDAs may also include global positioning system ("GPS")
technology for determining the location of the device.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique
numeric address used by computers on the Internet. An IP address is a series of
four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).
Every computer attached to the Internet computer must be assigned an IP address
so that Internet traffic sent from and directed to that computer may be directed
properly from its source to its destination. Most Internet service providers control
a range of IP addresses. Some computers have static—that is, long-term—IP
addresses, while other computers have dynamic—that is, frequently changed—IP
addresses.

f.  Internet: The Internet is a global network of computers and other electronic
devices that communicate with each other. Due to the structure of the Internet,
connections between devices on the Internet often cross state and international
borders, even when the devices communicating with each other are in the same
state.

22.     Based on my training, experience, and research, I know that the Device has
capabilities that allow it to serve as wireless telephone, digital camera, GPS navigation device,

and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

23.      Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

24.      *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw

conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

25. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

26. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve

10

the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

27.    In my training and experience I know that persons that engage in the illegal distribution of Controlled Deadly Substances utilize their cellular devices to engage in said business.  The Device is used as a daily means to contact customers and also contact suppliers to further facilitate their business.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Seth Cox
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives.

Subscribed and sworn to before me
on July 16, 2018:

UNITED STATES MAGISTRATE JUDGE
R. TRUMBLE

11